IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:09-CR-00253-F-1
No. 5:12-CV-00693-F

| | |
|---|---|
| ROBERT LEE McQUEEN, | ) |
| Petitioner, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| Respondent. | ) |

O R D E R

This matter is before the court on the Government's Motion to Dismiss [DE-156] Robert

Lee McQueen's pending Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C.

§ 2255 [DE-147]. Also before the court are McQueen's Motion to Compel Discovery [DE-149]

and Request for Leave to Subpoena Telephone Records [DE-150]. The issues have been fully

briefed, and the matters are now ripe for ruling. For the reasons set forth below, the

Government's Motion to Dismiss is ALLOWED in part and DENIED in part. McQueen's

Motion to Vacate, Motion to Compel Discovery, and Request for Leave to Subpoena Telephone

Records are DENIED.

## I. Factual and Procedural Background

On September 2, 2009, McQueen was charged in seven counts of a twelve-count

indictment. *See* Indictment [DE-1]. In Count One, McQueen was charged with conspiracy to

distribute 100 grams or more of heroin, in violation of 21 U.S.C. § 846. Counts Three, Six, and

Seven charged McQueen with distribution of heroin and aiding and abetting, in violation of 21

U.S.C. § 841(a)(1) and 18 U.S.C. § 2. In Count Nine, McQueen was charged with distribution of

heroin, in violation of 21 U.S.C. § 841(a)(1). Count Eleven charged McQueen with possession

with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1). In Count Twelve, McQueen was charged with possession of firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c).

At McQueen's arraignment, held on June 7, 2010, he pled not guilty to the indictment and exercised his right to a jury trial. Following a four-day jury trial, McQueen was found guilty on Counts One, Three, Six, Seven, Nine, Eleven, and Twelve.

On October 12, 2010, the court held McQueen's sentencing hearing and sentenced him to a total of 169 months' imprisonment. *See* Judgment [DE-109]. McQueen received 109 months' imprisonment on Counts One, Three, Six, Seven, Nine, and Eleven, and it was ordered that the sentences were to be served concurrently. McQueen received 60 months' imprisonment on Count Twelve, and it was ordered that the sentence was to be served consecutive to the sentences imposed in all other counts.

McQueen filed a Notice of Appeal [DE-111] on October 22, 2010. Before the Fourth Circuit Court of Appeals, McQueen's counsel filed a brief pursuant to *Anders v. California*, 386 U.S. 738, 744 (1967), stating that he found no meritorious issues for appeal but questioned the following: whether the trial court abused its discretion when it excluded evidence of a Government witness's prior felony convictions; whether the trial court erred in sentencing McQueen; and whether McQueen received ineffective assistance of counsel. *See* Fourth Circuit's Unpublished Opinion [DE-132] at 2. McQueen, proceeding *pro se*, filed a supplemental brief (1) challenging the sufficiency of the evidence and the calculation of the drug weight in the Presentence Report and (2) alleging a violation of his Confrontation Clause rights. *Id.*

2

On September 9, 2011, in an unpublished opinion, the Fourth Circuit concluded that there were "no meritorious issues for appeal" and affirmed McQueen's conviction and sentence. *Id.* at 4-5. McQueen did not file a petition for certiorari with the United States Supreme Court, and his time for doing so expired around December 9, 2011.

McQueen filed the instant *pro se* Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 [DE-147] on October 22, 2012. In his § 2255 motion, McQueen raises the following issues: (1) his appellate attorney provided ineffective assistance of counsel by filing an *Anders* brief; (2) his trial attorney provided ineffective assistance of counsel by failing to challenge the validity of the indictment; (3) his trial attorney provided ineffective assistance of counsel by failing to file a motion for a bill of particulars and a motion for severance; (4) he is actually innocent of the conspiracy conviction in Count One; (5) his trial attorney provided ineffective assistance of counsel by advising him not to testify; (6) his trial attorney provided ineffective assistance of counsel by advising Connie Diane Jones not to testify; (7) the prosecutor committed prosecutorial misconduct by knowingly using false testimony; (8) his trial attorney provided ineffective assistance of counsel when he failed to impeach false testimony; (9) his trial attorney provided ineffective assistance of counsel when he failed to properly prepare for trial; (10) his trial attorney provided ineffective assistance of counsel when he refused to allow Connie Diane Jones to testify at trial; (11) his trial attorney provided ineffective assistance of counsel when he failed to secure an expert witness to testify; (12) his trial attorney provided ineffective assistance of counsel when he failed to investigate and pursue information about a Government's witness; (13) his trial attorney provided ineffective assistance of counsel when he failed to investigate and produce evidence; (14) his trial attorney provided

3

ineffective assistance of counsel when he failed to obtain information demonstrating that Nadine Chambers was living at 1900 Slater Avenue and was using the apartment on Slater Avenue up until her arrest; (15) his trial attorney provided ineffective assistance of counsel when he allowed the Government to violate *Crawford v. Washington*, 541 U.S. 36 (2004); (16) his trial attorney provided ineffective assistance of counsel when he failed to move to suppress evidence from the Fayetteville Police Department; (17) his trial attorney provided ineffective assistance of counsel when he allowed the video surveillance to be introduced into evidence; (18) the Government violated *Brady v. Maryland*, 373 U.S. 83 (1963) by failing to disclose phone records; (19) his trial attorney provided ineffective assistance of counsel when he allowed the Government to violate *Brady*; (20) the Government violated *Brady* by failing to obtain and disclose Hunt's cell phone records; (21) his trial attorney provided ineffective assistance of counsel when he allowed the Government to not admit evidence; (22) he is actually innocent of Count Twelve; (23) his trial attorney provided ineffective assistance of counsel when he failed to produce evidence showing he had a Second Amendment right to bear arms; (24) he is actually innocent of the 18 U.S.C. § 924(c) conviction; (25) his trial attorney provided ineffective assistance of counsel when he failed to object to the variance between what was charged for the 18 U.S.C. § 924(c) violation, Count Twelve, and what was admitted into evidence; (26) his trial attorney provided ineffective assistance of counsel when he failed to request a multi-conspiracy jury instruction; (27) the court erred by failing to instruct the jury according to *U.S. v. Collins*, 415 F.3d 305 (4th Cir. 2005); and (28) the court erred by imposing a two-level enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1.

At the time McQueen filed his § 2255 motion, he also filed three other motions.

4

McQueen filed a Motion for Hearing and Appointment of Counsel [DE-148] in which he requests that counsel be appointed and a hearing be scheduled to address his § 2255 motion. The request for a hearing was allowed in an order [DE-213] entered on September 30, 2015. After it was determined he was entitled to counsel, McQueen received appointed counsel. McQueen also filed a Motion to Compel Discovery [DE-149] in which he seeks documents set forth in the memorandum filed in support of his § 2255 motion. Finally, McQueen filed a Request for Leave to Subpoena Telephone Records [DE-150] in which he seeks telephone records.

On December 26, 2012, the Government filed a Motion to Dismiss [DE-156]. In its Motion to Dismiss, the Government argues that dismissal is warranted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure because McQueen has failed to state a claim upon which relief can be granted. *Id.* at 1.

This court held an evidentiary hearing on January 20, 2016, to address McQueen's claim that his attorney provided ineffective assistance of counsel when he refused to allow Connie Diane Jones to testify on his behalf at trial. At the hearing, McQueen was present and represented by appointed counsel Geoffrey Ryan Willis. The Government was represented by Assistant United States Attorneys Kristine Louise Fritz and Jennifer May-Parker.

## II. Legal Standard

The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint, not to resolve conflicts of fact or to decide the merits of the action. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243-44 (4th Cir. 1999). In considering a motion to dismiss, the court assumes the truth of all facts alleged in the complaint and the existence of any fact that can be proved which is consistent with the complaint's allegations. *E. Shore Mkts., Inc. v. J.D.*

5

*Assocs. Ltd. P'shp*, 213 F.3d 175, 180 (4th Cir. 2000). However, the "[f]actual allegations must be enough to raise a right to relief above the speculative level" and the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 n.26 (4th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citations omitted); *accord Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Moreover, a court "need not accept the legal conclusions drawn from the facts" nor "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Mkts.*, 213 F.3d at 180.

### III. Discussion

#### A. Motion to Vacate

##### 1. McQueen's fourth and twenty-fourth claims have already been litigated.

In his fourth claim, McQueen claims that he is actually innocent of the conspiracy conviction in Count One. Mot. Vacate Mem. [DE-147-1] at 25-26. McQueen argues in his twenty-fourth claim that he is actually innocent of the 18 U.S.C. § 924(c) conviction, Count Twelve. *Id.* at 69-71. These issues were raised by McQueen and rejected by the Fourth Circuit Court of Appeals. *See* Unpublished Opinion [DE-132] at 2, 4; Appellate Docket [DE-43] at 1-2, 6-8. Absent a change in the law, a petitioner cannot relitigate in collateral proceedings an issue that has been rejected on direct appeal. *See United States v. Roane*, 378 F.3d 382, 396 n.7 (4th Cir. 2004) (citing *Boeckenhaupt v. United States*, 537 F.2d 1182, 1183 (4th Cir. 1976)). Consequently, McQueen's fourth and twenty-fourth claims must fail.

6

**2. McQueen has failed to state a claim of ineffective assistance of counsel in his first, second, third, fifth, sixth, eighth, ninth, eleventh, twelfth, thirteenth, fourteenth, fifteenth sixteenth, seventeenth, nineteenth, twenty-first, twenty-third, twenty-fifth, and twenty-sixth claims.**

McQueen has raised nineteen claims of ineffective assistance of counsel in his § 2255 motion. In order to prevail on a claim of ineffective assistance of counsel, a petitioner must show that (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). The petitioner bears the burden of proof as to both prongs of the *Strickland* standard. *United States v. Luck*, 611 F.3d 183, 186 (4th Cir. 2010). Under the first prong, the petitioner must show that his counsel's representation "fell below an objective standard of reasonableness" as measured by "prevailing professional norms." *Strickland*, 466 U.S. at 688. There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. As to the second prong, the petitioner must demonstrate that counsel's inadequate performance was prejudicial to him. *Id.* at 687. Specifically, the petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome." *Id.* With the *Strickland* standard in mind, the court will address each of McQueen's ineffective assistance of counsel claims in turn.

### a. Filed an *Anders* brief

In his first claim, McQueen alleges that his appellate attorney provided ineffective assistance of counsel by filing an *Anders* brief. Mot. Vacate [DE-147] at 8. McQueen also alleges that his appellate counsel provided ineffective assistance of counsel by asking his wife to

7

pay him $20,000.00 for an appeal. *Id.*

This claim must fail under the first prong of the *Strickland* standard because an appellate attorney need not address every conceivable issue. Rather, the court "must accord appellate counsel the 'presumption that he decided which issues were most likely to afford relief on appeal.'" *Bell v. Jarvis*, 236 F.3d 149, 164 (4th Cir. 2000) (quoting *Pruett v. Thompson*, 996 F.2d 1560, 1568 (4th Cir. 1993)). Moreover, McQueen's attorney did raise the following questions before the Fourth Circuit Court of Appeals: whether the trial court abused its discretion when it excluded evidence of a Government witness's prior felony convictions; whether the trial court erred in sentencing McQueen; and whether McQueen received ineffective assistance of counsel. *See* Fourth Circuit's Unpublished Opinion [DE-132] at 2. Also, McQueen has failed to show how his appellate attorney's performance fell below an objective standard of reasonableness by requesting $20,000.00 for an appeal.

Under the second prong of the *Strickland* standard, McQueen has failed to allege any prejudice. Thus, McQueen has failed to sufficiently state a claim for ineffective assistance of under both prongs of the *Strickland* standard. Consequently, McQueen's first claim will be dismissed.

### b. Failed to challenge the validity of the indictment

McQueen alleges in his second claim that his trial attorney provided ineffective assistance of counsel when he failed to challenge the validity of the indictment. Mot. Vacate Mem. [DE-147-1] at 17-20. Specifically, McQueen contends that Count One charges that the conspiracy was formed "knowingly and intentionally," as opposed to "willfully." *Id.* at 19. McQueen also contends that Counts Three, Six, Seven, Nine, and Eleven failed to allege that the offenses were

8

"willfully" engaged in. *Id.* McQueen concludes that his attorney's failure to challenge these defects in the indictment detrimentally denied him substantive due process under the Fifth and Sixth Amendments to the United States Constitution. *Id.* at 20.

The term "willfully" is defined as "[o]ne who acts intentionally, conscientiously and voluntarily." *Cross v. United States*, 311 F.2d 90, 94 (4th Cir. 1962) (quotation marks omitted). In order to demonstrate a conspiracy to distribute heroin, Count One in this case, the Government must establish that a defendant "knowingly and voluntarily became part of the conspiracy." *United States v. Williams*, 632 F.3d 129, 135 (4th Cir. 2011). Thus, the court concludes that it was not error for the Government to charge using the terms "knowingly and intentionally."

Because it was not error for the Government to charge using "knowingly and intentionally," it was not error for McQueen's attorney to fail to challenge the validity of the indictment on this basis. *See Moore v. United States*, 934 F. Supp. 724, 731 (E.D. Va. 1996) (holding that failure to raise a meritless argument can never amount to ineffective assistance). Moreover, McQueen bears the burden of establishing by a preponderance of the evidence a meritorious challenge to his indictment such that counsel's failure to object on that basis amounts to ineffective assistance of counsel. *See Murphy v. United States*, Nos. 5:11-CR-86-FL-1, 5:13-CV-32-FL, 2013 WL 3288312, at *2 (E.D.N.C. June 28, 2013) ("[T]he burden of proof is on the petitioner to establish his claim by a preponderance of the evidence."). McQueen has failed to sufficiently allege deficient performance by his trial attorney; thus, this second claim must fail under the first prong of the *Strickland* standard.

Because McQueen has made an insufficient showing on the performance prong of the *Strickland* standard, this court need not address the prejudice prong. *See Strickland*, 466 U.S. at

9

697 ("[T]here is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one.").

Accordingly, McQueen's second claim will be dismissed.

### c. Failed to file motions for bill of particulars and for severance

In his third claim, McQueen initially alleges that the Government's failure to charge him using the term "willfully" required his trial attorney to file a motion for bill of particulars. Mot. Vacate Mem. [DE-147-1] at 20. Next, McQueen alleges that his trial attorney erred when he failed to file a motion to sever his trial from that of his codefendant Randy Edward Chambers. *Id.* at 20-25. According to McQueen, the prejudice of being tried with Chambers stems from the fact that Chambers was not named in any of the substantive counts of the indictment, so according to McQueen, the jury was forced to infer that because McQueen was named in the substantive counts he must be guilty. *Id.* at 23. McQueen concludes that if his attorney had moved for a severance, this court would have either granted the severance or provided a curative instruction to the jury. *Id.* at 22.

### i. Motion for bill of particulars

As addressed above under McQueen's second claim, it was not error for the indictment to fail to charge McQueen using the term "willfully." Thus, McQueen has failed to allege deficient performance by his attorney for failing to move for a bill of particulars. Moreover, McQueen has failed to suggest how a motion for a bill of particulars would have been appropriate in this particular case. *See United States v. American Waste Fibers Co., Inc.*, 809 F.2d 1044, 1047 (4th Cir. 1987) (A bill of particulars is appropriate when an indictment fails to provide adequate information to allow a defendant to understand the charges and to avoid unfair surprise.) For

10

these reasons, this portion of the third claim must fail under the first prong of the *Strickland* standard.

Under the second prong of the *Strickland* standard, McQueen has failed to allege any prejudice caused by his attorney's failure to move for a bill of particulars. Consequently, this portion of the third claim must also fail under the second prong of the *Strickland* standard. Because this portion of the third claim fails under both prongs of the *Strickland* standard, it will be dismissed.

### ii. Motion for severance

Federal Rule of Criminal Procedure 8(b) provides that "[t]he indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). The Fourth Circuit Court of Appeals has observed that "[b]arring special circumstances, individuals indicted together should be tried together." *United States v. Brugman*, 655 F.2d 540, 542 (4th Cir. 1981).

Federal Rule of Criminal Procedure 14(a) permits severance "[i]f the joinder . . . appears to prejudice a defendant." Fed. R. Crim. P. 14(a). In making the severance determination generally, the focus is on whether the failure to sever will (1) result in the compromise of a specific trial right of one of the defendants or (2) prevent the jury from making a reliable judgment concerning guilt or innocence. *Zafiro v. United States*, 506 U.S. 534, 539 (1993). The mere fact that severance might result in a better chance of acquittal, or that the evidence against one defendant is stronger or more inflammatory against another, are insufficient bases for ordering separate trials. *See United States v. Strickland*, 245 F.3d 368, 384 (4th Cir. 2001);

11

*United States v. Reavis*, 48 F.3d 763, 767 (4th Cir. 1995).

McQueen's argument that his attorney should have filed a motion for severance centers on the fact that he was convicted of Count One, the conspiracy charge, and his codefendant, Chambers, was acquitted of the same charge. The court notes that McQueen's argument arises in hindsight because his attorney had no reason to know prior to trial that McQueen would be convicted and Chambers would be acquitted on the same charge. Because there is a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance, this court should not scrutinize counsel's performance by looking at the decisions in hindsight. *Strickland*, 466 U.S. at 688-689. Moreover, there is a presumption that codefendants will be tried jointly, and the presumption applies equally to conspiracy cases. *See Zafiro*, 506 U.S. at 537-38. For these reasons, McQueen has failed to sufficiently alleged deficient performance by his attorney for not moving to sever his case.

Under the second prong of the *Strickland* standard, the mere fact that Chambers was acquitted does not lead to a conclusion that McQueen suffered prejudice from a joint trial. In *United States v. Collins*, 412 F.3d 515, 520 (4th Cir. 2005), the Fourth Circuit Court of Appeals refused to overturn a conspiracy conviction simply because the same jury acquitted a coconspirator.

McQueen has failed to sufficiently allege a claim of ineffective assistance of counsel under both prongs of the *Strickland* standard. Accordingly, this portion of McQueen's third claim will be dismissed.

### d. Advised him not to testify

12

McQueen alleges in his fifth claim that his trial attorney provided ineffective assistance of counsel when he advised McQueen not to testify in his own defense. Mot. Vacate Mem. [DE-147-1] at 27-31. McQueen concludes that if he had testified, the jury would have returned a not guilty verdict. *Id.* at 27.

"[A] criminal defendant has a constitutional right to testify on his own behalf at trial." *United States v. Midgett*, 342 F.3d 321, 325 (4th Cir. 2003) (citing *Rock v. Arkansas*, 483 U.S. 44, 51 (1987)). Further, it is the criminal defendant who possesses ultimate authority to decide whether he will testify. *United States v. McMeans*, 927 F.2d 162, 163 (4th Cir. 1991). Defense counsel has the primary responsibility for advising the defendant of his right to testify and explaining the tactical implications of testifying or not. *Sexton v. French*, 163 F.3d 874, 882 (4th Cir. 1998).

The record from McQueen's trial reveals that the court specifically advised McQueen that he had a right to testify and a right not to testify. *See* June 16, 2010 Tr. [DE-127] at 218:22-219:2. McQueen was further advised that his attorney couldn't make the decision for him. *Id.* at 219: 4-5. After receiving this advice, McQueen informed the court that he was not going to testify. *Id* at 219: 11-12.

McQueen has failed to demonstrate how his attorney's advice not to testify at his trial amounted to constitutionally deficient performance under the first prong of the *Strickland* standard. It is common for defense counsel to advise their clients not to testify in order to avoid being subjected to cross-examination by the prosecutor. McQueen has failed to show how his attorney's advice, similar to the advice offered in most criminal cases, fell below an objective standard of reasonableness.

13

Under the second prong of the *Strickland* standard, McQueen summarily alleges that if he had testified, the jury would have returned a not guilty verdict. Mot. Vacate Mem. [DE-147-1] at 27. This conclusory claim of prejudice must fail. *See United States v. Terry*, 366 F.3d 312, 316 (4th Cir. 2004) ("[C]onclusory allegations are insufficient to establish the requisite prejudice under *Strickland*."). Because McQueen's fifth claim fails under both prongs of the *Strickland* standard, it will be dismissed.

### e. Advised Connie Jones not to testify

In his sixth claim, McQueen alleges that his trial attorney provided ineffective assistance of counsel when he advised Connie Jones, a potential witness, that her testimony could lead to prosecution.[1] Mot. Vacate Mem. [DE-147-1] at 31-34. McQueen concludes that his attorney's advice to Jones created a conflict of interest and detrimentally prejudiced his defense. *Id.* at 32-33.

In order for a petitioner to show that his attorney was ineffective because he was operating under a conflict of interest, he must establish that "(1) petitioner's lawyer operated under a 'conflict of interest' and (2) such conflict 'adversely affected his lawyer's performance.'" *United States v. Nicholson,* 611 F.3d 191, 195 n.2 (4th Cir. 2010) (quoting *Cuyler v. Sullivan,* 446 U.S. 335, 348 (1980)). When a petitioner can establish both prongs, it is not necessary to establish prejudice because the conflict of interest is assumed to have been harmful. *United States v. Tatum,* 943 F.2d 370, 375 (4th Cir.1991). Under the first prong, the petitioner must

---

[1] The evidence from McQueen's trial reveals that Jones was a prostitute who purchased heroin from McQueen and solicited Stephanie Clark, a witness for the Government, as a buyer. *See* June 15, 2010 Tr. [DE-126] at 199:12-200:25.

14

establish that his attorney had an "actual conflict," which has been defined by the Fourth Circuit as occurring when an attorney "actively represents conflicting interests." *Id.* The second prong requires the petitioner to show that the actual conflict adversely affected the attorney's performance. *Id.* In order to make this showing, the petitioner must (i) "identify a plausible alternative defense strategy or tactic that his defense counsel might have pursued"; (ii) "show that the alternative strategy or tactic was objectively reasonable under the facts of the case known to the attorney at the time of the attorney's tactical decision"; and (iii) "establish that the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict." *Mickens v. Taylor*, 240 F.3d 348, 361 (4th Cir. 2001).

The court concludes that McQueen has failed to state a claim for ineffective assistance of counsel based on a conflict of interest by his attorney. Under the first prong, McQueen has failed to state an actual conflict of interest. Namely, McQueen has not shown that his attorney's advice to Jones created a conflict of interest by actively representing conflicting interests. As for the second prong, McQueen's summary claims that his defense was detrimentally prejudiced must fail. In sum, McQueen has failed to sufficiently allege that his attorney provided ineffective assistance of counsel because he was operating under a conflict of interest. Accordingly, McQueen's sixth claim will be dismissed.

### f. Failed to impeach false testimony

McQueen alleges in his eighth claim that his trial attorney provided ineffective assistance of counsel when he failed to impeach the testimony provided by Chester Hunt and Elmer Campbell. Mot. Vacate Mem. [DE-147-1] at 40-41. McQueen concludes that if his attorney had impeached Hunt and Campbell, Counts One and Eleven would have been dismissed. *Id.* at 40.

15

This claim is belied by the transcript from McQueen's trial. The record reflects that McQueen's attorney effectively cross-examined both Hunt and Campbell. *See* June 16, 2010 Tr. [DE-127] at 97: 22-111: 3, 117: 4-121: 10. McQueen's attorney asked Hunt about his heroin use and got him to admit he had been using heroin for thirty-five to forty years and had been addicted for years. *Id.* at 98: 14-24. McQueen's attorney asked Hunt about his prior convictions for various drug offenses and got him to admit that he had been convicted of possession of heroin, possession of cocaine, possession of marijuana, and possession of drug paraphernalia. *Id.* at 98: 25-99: 11. McQueen's attorney also got Hunt to admit that he was arrested on state charges and began cooperating with law enforcement. *Id.* at 99: 12-100: 9. McQueen's attorney got Hunt to admit that in exchange for his plea of guilty to a single count of possession with intent to distribute heroin, his charge for conspiracy to distribute heroin would be dismissed. *Id.* at 101: 20-102: 7. McQueen's attorney also got Hunt to admit that he did not start dealing with McQueen "immediately" after his supplier Bethea's death, a fact which contradicted Hunt's testimony on direct examination. *Id.* at 80: 11-19, 109: 11-18. As for Campbell, McQueen's attorney challenged his testimony related to his claim for obstruction of justice by pointing out that Campbell didn't tell the police that McQueen asked him to say that the drugs were Hunt's drugs until about fourteen months after it had all happened.[2] *Id.* at 119: 1-22.

---

[2] The facts supporting the obstruction of justice claim are as follows:

Following's **MCQEEN'S** arrest, he contacted Elmer Campbell and arranged for them to meet at **MCQUEEN'S** rental property in Fayetteville, North Carolina. During the meeting, **MCQUEEN** attempted to bribe Campbell by offering him money in exchange for Campbell's false testimony. Specifically, **MCQUEEN** instructed Campbell to lie and tell authorities the heroin seized on October 28, 2008, belonged to Hunt. Additionally, on July 21, 2009, while Hunt was in custody at the Cumberland County Jail in Fayetteville, **MCQUEEN** sent his associate, Earl Reaves,

16

In light of the foregoing, the record belies McQueen's allegations that his attorney provided deficient performance under the first prong of the *Strickland* standard by failing to impeach the testimony provided by Hunt and Campbell. Moreover, McQueen's conclusory allegation that if his attorney had impeached Hunt and Campbell, Counts One and Eleven would have been dismissed does not sufficiently allege prejudice under the second prong of the *Strickland* standard. *See Terry*, 366 F.3d at 316 ("[C]onclusory allegations are insufficient to establish the requisite prejudice under *Strickland*."). Because McQueen's eighth claim fails under both prongs of the *Strickland* standard, it will be dismissed.

### g. Failed to properly prepare for trial

In his ninth claim, McQueen alleges that his trial attorney provided ineffective assistance of counsel when he failed to properly prepare for trial. Mot. Vacate Mem. [DE-147-1] at 41. McQueen initially contends that his trial attorney failed to subpoena Chester Hunt's phone records. *Id.* at 41-42. McQueen further contends that his trial attorney provided deficient performance when he returned Hunt's cell phone. *Id.* at 43.

### i. Failed to subpoena Hunt's phone records

McQueen argues that his attorney should have subpoenaed Hunt's telephone records because Hunt's telephone records contradicted his testimony that he got heroin from McQueen and otherwise would have established there was no conspiracy. *Id.* at 42. During McQueen's

---

to visit Hunt. During the visit, Mr. Reaves informed Hunt that **MCQUEEN** would post bond for Hunt and get him out of jail if Hunt agreed to, "go on the run once released."

PSR ¶ 16.

17

trial, Detective Stein testified that he performed a phone dump[3] on Hunt's telephone. *See* June

15, 2010 Tr. [DE-126] at 170: 4-6. This information would have been produced in discovery to

McQueen's counsel. Because McQueen's attorney had Hunt's phone records in his possession, it

was not deficient performance for him to fail to independently subpoena the records. McQueen

has made an insufficient showing on the performance prong of the *Strickland* standard; therefore,

this court need not address the prejudice prong. *See Strickland,* 466 U.S. at 697 ("[T]here is no

reason for a court deciding an ineffective assistance claim to . . . address both components of the

inquiry if the defendant makes an insufficient showing on one."). Consequently, this portion of

McQueen's ninth claim will be dismissed.

### ii. Returned Hunt's cell phone

McQueen argues that his trial attorney provided ineffective assistance of counsel by

returning Hunt's cell phone to him when he knew that it was material evidence. Mot. Vacate

Mem. [DE-147-1] at 43. McQueen's allegations that Hunt's cell phone was returned are belied

by the record. At McQueen's trial, Detective Stein testified that Hunt's cell phone had been in

the care, control, and custody of the Fayetteville Police Department since the date of the phone

dump. *See* June 15, 2010 Tr. [DE-126] at 171: 3-12. Because McQueen has made an

insufficient showing on the performance prong of the *Strickland* standard, this court need not

address the prejudice prong. *See Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court

deciding an ineffective assistance claim to . . . address both components of the inquiry if the

defendant makes an insufficient showing on one."). Accordingly, this portion of McQueen's

---

[3] Detective Stein explained that a phone dump is conducted when you go through the phone and write down the contact numbers that are saved in the phone, incoming calls, outgoing calls, missed calls, and received calls. *See* June 15, 2010 Tr. [DE-126] at 168: 8-15.

18

ninth claim will be dismissed.

### h. Failed to secure an expert witness

McQueen alleges in his eleventh claim that his trial attorney provided ineffective assistance of counsel by failing to secure an expert witness to testify regarding why the Government should have had all of the evidence fingerprinted. Mot. Vacate Mem. [DE-147-1] at 45-46. McQueen concludes that because there was no fingerprint testing, he was deprived of a proper defense and substantive due process. *Id.* at 46.

The items McQueen contends should have been fingerprinted were found either in his residence or his personal vehicle. During McQueen's trial, Detective Don Bell, with the Fayetteville Police Department, testified they did not run any DNA tests on the evidence seized and that it is not standard operating procedure to request DNA tests in a drug investigation. *See* June 15, 2010 Tr. [DE-126] at 81: 25-82: 25. Detective Bell further testified that it is not standard operating procedure to request fingerprint evidence during drug investigations because fingerprint testing from drug operations results in very little in the way of fingerprints. *Id.* at 82: 17-83: 9. If they are able to get any kind of results in fingerprints, they only get partials that have never been able to identify a singular person. *Id.* at 83: 2-5. Detective Bell explained that the only time he would request fingerprints is when it was a circumstantial case where he didn't have a suspect and wanted to find a suspect. *Id.* at 83: 6-9. According to Detective Bell, this was not that case here because the evidence he had surrounding the search warrant, the buys, and everything else made it apparent who the evidence belonged to and who the suspect was. *Id.* at 83: 10-13

*Strickland's* presumption of reasonableness is particularly difficult to overcome in a claim

19

of ineffectiveness for failing to call a witness, "given that the decision whether to call a defense witness is a strategic decision demanding the assessment and balancing of perceived benefits against perceived risks, and one to which we must afford enormous . . . deference." *United States v. Terry,* 366 F.3d 312, 317 (4th Cir. 2004) (quotation and punctuation omitted). The court concludes that McQueen has failed to sufficiently allege deficient performance by his attorney because his attorney's decision not to call an expert witness falls within the broad deference accorded to defense counsel's decision regarding whether or not to call witnesses. Thus, this claim fails under the first prong of the *Strickland* standard.

Even if McQueen had sufficiently alleged deficient performance, his conclusory claim that the failure to secure an expert witness deprived him a proper defense and substantive due process fails to sufficiently state prejudice under the second prong of the *Strickland* standard. *See Terry,* 366 F.3d at 316 ("[C]onclusory allegations are insufficient to establish the requisite prejudice under *Strickland.*"). Moreover, when considering the second prong of the *Strickland* analysis, the prejudice prong, the court "can only grant relief under . . . *Strickland* if the 'result of the proceeding was fundamentally unfair or unreliable.'" *Sexton v. French,* 163 F.3d 874, 882 (4th Cir. 1998) (quoting *Lockhart v. Fretwell,* 506 U.S. 364, 369 (1993)). The court declines to conclude that McQueen's attorney's failure to secure an expert witness to testify regarding why the Government should have had the evidence fingerprinted rendered his trial fundamentally unfair or unreliable. Thus, McQueen has failed to sufficiently allege prejudice. Because McQueen's eleventh claim fails under both prongs of the *Strickland* standard, it will be dismissed.

20

### i. Failed to investigate and pursue information about Stephanie Clark

In his twelfth claim, McQueen alleges that his trial attorney provided ineffective assistance of counsel when he failed to investigate and pursue the following facts about the Government's witness Stephanie Clark: she was a known drug addict who gave birth to a child with birth defects, and she worked as an informant to get her charges dropped and get her child back from the State. Mot. Vacate Mem. [DE-147-1] at 46-47.

McQueen has failed to show it was deficient performance for his attorney not to question Clark about her motive for testifying because the record reveals that McQueen's attorney did question Clark about her motive for testifying. At trial, McQueen's attorney brought out that Clark decided to cooperate with law enforcement after she was told that she would be arrested if she refused to cooperate. *See* June 16, 2010 Tr. [DE-127] at 20: 6-18. Accordingly, this claim fails under the first prong of the *Strickland* standard.

This claim must also fail under the second prong of the *Strickland* standard because McQueen has failed to allege any prejudice caused by his attorney's failure to investigate and pursue the information about Clark. Because this claim fails under both prongs of the *Strickland* standard, McQueen's twelfth claim will be dismissed.

### j. Failed to establish that the money found at arrest was legitimate

McQueen alleges in his thirteenth claim that his trial attorney provided ineffective assistance of counsel when he failed to investigate and produce evidence establishing that the money found on him when he was arrested was legitimate money. Mot. Vacate Mem. [DE-147-1] at 47-48.

This claim must fail under the second prong of the *Strickland* standard because McQueen

21

has failed to allege any prejudice caused by his trial attorney's failure to investigate and produce evidence establishing that the money found on him when he was arrested was legitimate money. McQueen has made an insufficient showing on the prejudice prong; thus, this court need not address the performance prong. *See Strickland*, 466 U.S. at 697. Accordingly, McQueen's thirteenth claim will be dismissed.

### k. Failed to obtain information about Nadine Chambers

In his fourteenth claim, McQueen alleges that his trial attorney provided ineffective assistance of counsel when he failed to obtain information demonstrating that Nadine Chambers was living at 1900 Slater Avenue and was using the apartment on Slater Avenue up until her arrest. Mot. Vacate Mem. [DE-147-1] at 48-49. McQueen concludes that if his attorney had provided any credible evidence, the jury verdict would have been different. *Id.* at 49.

McQueen's bare conclusion that if his attorney had gotten the evidence about Chambers, the jury verdict would have been different must fail. *See Terry*, 366 F.3d at 316 ("[C]onclusory allegations are insufficient to establish the requisite prejudice under *Strickland*.") Because McQueen has made an insufficient showing on the prejudice prong of the *Strickland* standard, this court need not address the performance prong. *See Strickland*, 466 U.S. at 697. Consequently, McQueen's fourteenth claim will be dismissed.

### l. Allowed the Government to violate *Crawford v. Washington*

McQueen alleges in his fifteenth claim that his trial attorney provided ineffective assistance of counsel when he allowed the Government to violate *Crawford v. Washington*, 541 U.S. 36 (2004). Mot. Vacate Mem. [DE-147-1] at 49-53. The Sixth Amendment's Confrontation Clause provides that "the accused shall enjoy the right . . . to be confronted by the

22

witnesses against him." *Crawford,* 541 U.S. at 42. In *Crawford*, the Supreme Court held that testimonial out-of-court statements are generally barred from admission at trial by the Confrontation Clause unless the witness is unavailable, and the defendant had prior opportunity to cross-examine the witness, regardless of whether such statements are deemed reliable by the court. 541 U.S. at 68. A statement is deemed testimonial if the "primary purpose" of the conversation was to "creat[e] an out-of-court substitute for trial testimony." *Michigan v. Bryant*, 562 U.S. 344, 358 (2011).

### i. Stipulated to lab analysis of the drugs

In his first assignment of error under *Crawford*, McQueen alleges that his trial attorney provided ineffective assistance of counsel when he stipulated to the lab analysis of the drugs and prevented cross-examination of the lab technicians. Mot. Vacate Mem. [DE-147-1] at 49-51. McQueen concludes that if the forensic technicians who analyzed the drugs from the various controlled buys had been called to testify, their testimony would have established whether or not the drugs came from the same source. *Id.* at 50. According to McQueen, this was a key factor emphasized by the prosecution during its case. *Id.*

At McQueen's trial, Detective Stein with the Fayetteville Police Department testified on direct examination about the results of the chemical analysis testing performed by the State Bureau of Investigation. *See* June 15, 2010 Tr. [DE-126] at 159: 23-167: 19. Thus, McQueen was afforded the opportunity on cross-examination to confront Detective Stein about these test results, despite the fact that his attorney stipulated to their admission. McQueen's *Crawford* claim must fail because he has not sufficiently alleged prejudice under the second prong of the *Strickland* standard. Accordingly, this portion of McQueen's fifteenth claim will be dismissed.

23

### ii. Failed to object to hearsay from Detective Valdez

In his second assignment of error under *Crawford*, McQueen alleges that his trial attorney provided ineffective assistance of counsel when he failed to prevent hearsay testimony provided by Detective Valdez. Mot. Vacate Mem. [DE-147-1] at 51. Specifically, McQueen contends that Detective Valdez testified "that Charlene was getting a new supplier." *Id.* McQueen argues that this testimony was speculative and violated *Crawford. Id.*

The court concludes that this claim must fail under the second prong of the *Strickland* standard because McQueen has failed to allege any prejudice caused by his attorney's failure to prevent Valdez's alleged hearsay testimony.[4] McQueen has made an insufficient showing on the prejudice prong of the *Strickland* standard; thus, this court need not address the performance prong. *See Strickland,* 466 U.S. at 697. Accordingly, this portion of the fifteenth claim will be dismissed.

### iii. Failed to object to Detective Valdez's testimony

In his third assignment of error under *Crawford*, McQueen alleges that his trial attorney provided ineffective assistance of counsel when he allowed Detective Valdez to testify that "all she knew about McQueen was told to her from Connie Jones, her informant." Mot. Vacate Mem. [DE-147-1] at 52. McQueen contends this was objectionable hearsay because Jones was available to testify and was not called to testify by either the Government or defense counsel. *Id.*

This claim must fail under the second prong of the *Strickland* standard because McQueen

---

[4] Hearsay is "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). The court fails to see how the testimony "that Charlene was getting a new supplier" was hearsay.

24

has failed to allege any prejudice caused by his attorney's failure to object to Detective Valdez's alleged objectionable hearsay. McQueen has made an insufficient showing on the prejudice prong of the *Strickland* standard; thus, this court need not address the performance prong. *See Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one."). Consequently, this portion of the fifteenth claim will be dismissed.

### iv. Failed to object to lack of fingerprint analysis

In his fourth assignment of error under *Crawford*, McQueen alleges that his trial attorney provided ineffective assistance of counsel when he failed to object to the Government's failure to submit evidence of fingerprint analysis. Mot. Vacate Mem. [DE-147-1] at 52. McQueen concludes that this deprived him of the right to confrontation.[5] *Id.*

The court concludes that McQueen has failed to sufficiently allege deficient performance under the first prong of the *Strickland* standard. During McQueen's trial, his attorney challenged law enforcement's decision not to perform fingerprint tests. *See* June 15, 2010 Tr. [DE-126] at 118: 2-119: 12.

Even if McQueen had sufficiently alleged deficient performance, the court concludes that he has failed to sufficiently allege prejudice under the second prong of the *Strickland* standard. McQueen, without explanation, summarily concludes that he was deprived of the right to confrontation. Mot. Vacate Mem. [DE-147-1] at 52. The court is unable to discern how McQueen was prejudiced by his attorney's alleged failure to object to the Government not

---

[5] According to McQueen, this is an issue of first impression. Mot. Vacate Mem. [DE-147-1] at 52

submitting evidence of fingerprint analysis, and McQueen has failed to provide an explanation.

In sum, this portion of the fifteenth claim must fail under both prongs of the *Strickland* standard. Accordingly, this portion of the fifteenth claim will be dismissed.

### v. Failed to object to the Clarks' testimony

In his fifth assignment of error under *Crawford*, McQueen alleges that his trial attorney provided ineffective assistance of counsel when he failed to object to Justin and Stephanie Clark's introduction of testimony from Connie Jones. *Id.* at 52-53.

This claim must fail under the second prong of the *Strickland* standard because McQueen has failed to allege any prejudice caused by the Clarks' testimony. Because McQueen has made an insufficient showing on the prejudice prong of the *Strickland* standard, this court need not address the performance prong. *See Strickland*, 466 U.S. at 697. Consequently, this portion of the fifteenth claim will be dismissed.

### m. Failed to move to suppress evidence from Fayetteville Police Department

In his sixteenth claim, McQueen alleges that his trial attorney provided ineffective assistance of counsel when he failed to move to suppress evidence from the Fayetteville Police Department, on the basis that they failed to send the evidence to the lab for fingerprints. Mot. Vacate Mem. [DE-147-1] at 53-55. McQueen further alleges that his trial attorney provided ineffective assistance of counsel by failing to send the evidence for fingerprint analysis. *Id.* at 53. McQueen concludes that the fingerprint evidence would have either made or destroyed the Government's case. *Id.*

The court will first address McQueen's claim that his trial attorney provided ineffective assistance by failing to move to suppress evidence because it was not fingerprinted. The court

26

concludes McQueen has failed to allege deficient performance. Even if McQueen's attorney had raised this meritless argument, it would have been overruled. There is absolutely no requirement that all physical evidence be subjected to forensic testing. When law enforcement declines to test for fingerprints, it leaves the door open for the defense to argue that they should have conducted fingerprint analysis and the failure to conduct fingerprint analysis creates a reasonable doubt. This is exactly what happened in McQueen's case. At trial, McQueen's attorney challenged law enforcement's decision not to perform fingerprint tests. *See* June 15, 2010 Tr. [DE-126] at 118: 2-19: 12. For these reasons, this portion of McQueen's sixteenth claim must fail under the first prong of the *Strickland* standard.

Next, the court will address McQueen's claim that his attorney should have sent the evidence for fingerprint analysis. Even if McQueen had sufficiently alleged deficient performance by his attorney for failing to send the evidence for fingerprint analysis, he has not sufficiently alleged prejudice because McQueen fails to allege that the fingerprint analysis would have provided exculpatory evidence.

As set forth, both of McQueen's ineffective assistance of counsel claims must fail under *Strickland*. Accordingly, McQueen's sixteenth claim will be dismissed.

### n. Allowed the video CD to be introduced into evidence

McQueen alleges in his seventeenth claim that his trial attorney provided ineffective assistance of counsel by failing to object to the allegedly improper authentication of the video surveillance. Mot. Vacate Mem. [DE-147-1] at 55-57. McQueen concludes that the introduction of the video surveillance and testimony provided by Detective Bell deprived him due process. *Id.* at 57.

27

The transcript from McQueen's trial reveals that the prosecutor laid the proper foundation for the surveillance videos, and the videos were properly authenticated and introduced into evidence through the testimony of Detective Bell. *See* June 15, 2010 Tr. [DE-126] at 13:10-24: 22. Because McQueen has failed to demonstrate any specific errors in authentication and introduction of the video surveillance, he has failed to show his attorney provided deficient performance by failing to object. *See Moore*, 934 F. Supp. at 731 (holding that failure to raise a meritless argument can never amount to ineffective assistance). Consequently, McQueen's seventeenth claim will be dismissed.

### o. Allowed the prosecution to violate *Brady v. Maryland*

In his nineteenth claim, McQueen alleges that his trial attorney provided ineffective assistance of counsel when he knowingly and intentionally allowed the Government to violate *Brady* with respect to phone records.[6] Mot. Vacate Mem. [DE-147-1] at 62-64.

This claim must fail under the second prong of the *Strickland* because McQueen has failed to allege any prejudice caused by his attorney allowing the Government to violate *Brady* with respect to phone records. Because McQueen has made an insufficient showing on the prejudice prong of the *Strickland* standard, this court need not address the performance prong. *See Strickland*, 466 U.S. at 697. Consequently, McQueen's nineteenth claim will be dismissed.

### p. Allowed Government not to admit evidence showing a possible supplier

McQueen alleges in his twenty-first claim that his trial attorney provided ineffective assistance of counsel when he allowed the Government to not admit into evidence that

---

[6] "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

28

investigation revealed that Madeline Chambers was seen in a red SUV owned or operated by a well-known heroin dealer and convicted felon. Mot. Vacate Mem. [DE-147-1] at 66-67. McQueen concludes that if this information had been before the jury, it would have created reasonable doubt regarding whether the driver of the red SUV was Charlene's supplier. *Id.* at 67.

This claim must fail under the first prong of the *Strickland* standard because McQueen has failed to sufficiently allege deficient performance by his attorney. McQueen's attorney had no control over what the prosecution admitted into evidence. Accordingly, McQueen's twenty-first claim will be dismissed.

### q. Failed to present evidence of his Second Amendment right to bear arms

In his twenty-third claim, McQueen alleges that his trial attorney provided ineffective assistance of counsel when he failed to produce evidence to show that he had a Second Amendment right to bear arms. Mot. Vacate Mem. [DE-147-1] at 68-69. Specifically, McQueen contends that the firearms found in his SUV were intended to be used in his legitimate job as a bail bondsman. *Id.* at 69.

This claim must fail under the second prong of the *Strickland* standard because McQueen has failed to allege any prejudice caused by his attorney's failure to produce evidence showing that he had a Second Amendment right to bear the firearms that were seized. Because McQueen has made an insufficient showing on the prejudice prong of the *Strickland* standard, this court need not address the performance prong. *See Strickland*, 466 U.S. at 697. Consequently, McQueen's twenty-third claim will be dismissed.

### r. Failed to object to the variance

McQueen alleges in his twenty-fifth claim that his trial attorney provided ineffective

29

assistance of counsel when he failed to object to the variance between what was charged for the § 924(c) violation and the evidence admitted to support the charge. Mot. Vacate Mem. [DE-147-1] at 71-72.

This claim must fail under the second prong of the *Strickland* standard because McQueen has failed to allege any prejudice caused by his attorney's failure to object. Because McQueen has made an insufficient showing on the prejudice prong of the *Strickland* standard, this court need not address the performance prong. *See Strickland*, 466 U.S. at 697. Accordingly, McQueen's twenty-fifth claim will be dismissed.

### s. Failed to request a multi-conspiracy instruction

In his twenty-sixth claim, McQueen alleges that his trial attorney provided ineffective assistance of counsel when he failed to request a multi-conspiracy instruction. Mot. Vacate Mem. [DE-147-1] at 73.

This claim must fail under the second prong of the *Strickland* standard because McQueen has failed to allege any prejudice. Because McQueen has made an insufficient showing on the prejudice prong of the *Strickland* standard, this court need not address the performance prong. *See Strickland*, 466 U.S. at 697. Consequently, McQueen's twenty-sixth claim will be dismissed.

### 3. McQueen's seventh, eighteenth and twentieth claims fail to sufficiently allege prosecutorial misconduct.

McQueen has raised three claims of prosecutorial misconduct. In order for a prosecutor's conduct to qualify as prosecutorial misconduct, the conduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Scheetz,*

30

293 F.3d 175, 185 (4th Cir. 2002) (quoting *United States v. Morsley*, 64 F.3d 907, 913 (4th Cir.

1995)).  Reversible prosecutorial misconduct has two components: first, the defendant must

show that the prosecutor's remarks or conduct were improper; and second, the defendant must

show that such remarks or conduct prejudicially affected his substantial rights such that he was

deprived of a fair trial. *Id.* (citing *United States v. Mitchell*, 1 F.3d 235, 240 (4th Cir. 1993)).

When assessing prejudice, the court must consider the following:

> (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury
> and to prejudice the accused; (2) whether the remarks were isolated or extensive;
> (3) absent the remarks, the strength of competent proof introduced to establish the
> guilt of the accused; (4) whether the comments were deliberately placed before the
> jury to divert attention to extraneous matters; (5) whether the prosecutor's remarks
> were invited by improper conduct of defense counsel; and (6) whether curative
> instructions were given to the jury.

*United States v. Wilson*, 624 F.3d 640, 656-57 (4th Cir. 2010) (citing *Scheetz*, 293 F.3d at 186).

The court will address each of McQueen's prosecutorial misconduct claims with this standard in

mind.

### a. Knowingly used false testimony

In his seventh claim, McQueen alleges that the prosecutor committed prosecutorial

misconduct by knowingly eliciting and using false testimony.  Mot. Vacate Mem. [DE-147-1] at

34-40.  McQueen points out the following about Arthur Hunt's testimony:

> Mr. Hunt's direct testimony was that on October 28, 2008 after being seen leaving
> 1900 Slater Ave.; he was stopped by Fayetteville Police Department ("FPD").  He
> was found to have 100 bindles of heroin in his possession, which Mr. Hunt testified
> that was obtained from [McQueen] [A]nd that [McQueen] was the source of his
> heroin for over seven or eight months ("May of 2008 to October of 2008").  Hunt's
> complete testimony rested on his presence at 1900 Slater Avenue on October 28,
> 2008.  He testified that he use [sic] to meet [McQueen] at 1900 Slater Ave., where
> he obtained his heroin, that on numerous occasions he saw Madeline Chambers at
> 1900 Slater Avenue, and that he helped the petitioner to cut heroin.

31

*Id.* at 36 (internal citations omitted). McQueen concludes that his substantive due process rights were violated pursuant to *Napue v. Illinois*, 360 U.S. 264 (1959). *Id.* at 34.

The Due Process Clause obliges the government "not [to] knowingly use false evidence, including false testimony, to obtain a tainted conviction." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). Due process is violated when "regardless of whether the prosecution solicited testimony it knew to be false or simply allowed such testimony to pass uncorrected." *Boyd v. French,* 147 F.3d 319, 329 (4th Cir. 1998) (citing *Giglio v. United States*, 405 U.S. 150, 153 (1972)). In order to succeed on a claim of prosecutorial misconduct due to the use of perjured testimony, a petitioner must demonstrate: (1) the testimony was false; (2) the Government knew the testimony was false; and (3) there is a reasonable probability that the verdict was impacted by the false testimony. *United States v. Roane*, 378 F.3d 382, 400 (4th Cir. 2004).

In this case, McQueen alleges that the *Napue* error is "obviously within the [Fayetteville Police Department's] investigative reports." Mot. Vacate Mem. [DE-147-1] at 37. The reports referenced by McQueen do not establish that the Government elicited false testimony at trial. Because McQueen has failed to demonstrate that Hunt testified falsely or that the Government knew that such testimony was false, he has failed to demonstrate prosecutorial misconduct. Consequently, McQueen's seventh claim must be dismissed.

### b. Failed to disclose phone records

McQueen alleges in his eighteenth claim that the Government knowingly violated *Brady* by failing to disclose his phone records and Madeline Chambers's phone records after they were received pursuant to subpoenas. Mot. Vacate Mem. [DE-147-1] at 58-62. McQueen contends that the Government failed to disclose these records because it destroyed their theory of the case.

32

*Id.* at 59. Specifically, McQueen contends that the phone records would have contradicted the Government's contention that Charlene Chambers called McQueen each time to obtain the heroin she sold. *Id.* at 61.

In his twentieth claim, McQueen alleges that the Government violated *Brady* by failing to obtain and disclose Hunt's cell phone records from May 2008 through October 28, 2008. Mot. Vacate Mem. [DE-147-1] at 64-66. McQueen contends that the Government knowingly and intentionally failed to subpoena Hunt's phone records. *Id.* at 65. McQueen concludes that Hunt's phone records would have established that Hunt committed perjury and would have undermined the strength of the Government's case against McQueen. *Id.* at 64-65.

At McQueen's trial, Detective Valdez testified that the Government subpoenaed cell phone records from different cells phones but did not receive information in response to the first subpoena. *See* June 14, 2010 Tr. [DE-125] at 95: 8-19. When the Government tried again to subpoena the records, it was too late because the phone company had already dumped everything. *Id.* at 95: 19-20. Thus, the Government only had the phone records pulled directly from the telephones seized at Madeline Chambers's residence on Henderson and McQueen's residence on Slater. *Id.* at 95: 24-25. Later during the trial, Detective Stein testified that he conducted a phone dump and manually pulled information from the phones seized from McQueen and his coconspirators, Madeline Chambers and Chester Hunt. *See* June 15, 2010 Tr. [DE-126] at 167: 24-171: 15. The information from this phone dump would have been produced to McQueen's counsel as discovery. Additionally, McQueen's attorney's questioning of Detective Stein about the phone records reveals a familiarity suggesting that he had reviewed the phone records prior to trial. *Id.* at 173: 25-185: 20.

33

Even if the Government purposefully withheld the information received from the subpoenas to the phone company as McQueen has alleged, McQueen has failed to suggest how this prejudicially affected his substantial rights such that he was deprived of a fair trial. Specifically, McQueen had the information from Detective Stein's phone dumps, which manually pulled the information from the seized phones of McQueen and his co-conspirators. Consequently, McQueen's eighteenth and twentieth claims will be dismissed.

## 4. McQueen's twenty-second, twenty-seventh, and twenty-eighth claims are procedurally defaulted.

McQueen alleges in his twenty-second claim that he is actually innocent of the 18 U.S.C. § 924(c) offense because there was not proof of the relation of the firearm in furtherance of the possession of heroin as alleged in Count Eleven, the Government's closing argument and the jury instructions conflict with each other and confused the jury on the possession of the firearm, and the conviction violates his Second Amendment right to bear arms under *District of Columbia v. Heller*, 554 U.S. 570 (2008). Mot. Vacate Mem. [DE-147-1] at 68. In his twenty-seventh claim, McQueen argues that the court erred by failing to instruct the jury according to *U.S. v. Collins*, 415 F.3d 305 (4th Cir. 2005). *Id.* at 73. Finally, McQueen contends in his twenty-eighth claim that the evidence was insufficient to support the two-level enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1. *Id.* at 73-74

"Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal." *Bousley v. United States*, 523 U.S. 614, 621 (1998) (citation and internal quotation marks omitted). When a defendant procedurally defaults a claim by failing to raise it on direct appeal, the claim is cognizable in habeas "only if the defendant can first demonstrate either

34

'cause' and actual 'prejudice,' or that he is 'actually innocent.'" *Id.* at 622 (citations omitted).

In order to show "cause" for a procedural default, a movant must demonstrate that some objective factor external to the record impeded his counsel's efforts to bring a claim on direct appeal. *Murray v. Carrier*, 477 U.S. 478, 492 (1986); *Turner v. Jabe*, 58 F.3d 924, 927 (4th Cir. 1995). "[C]ause for a procedural default must turn on something external to the defense, such as the novelty of the claim or a denial of effective assistance of counsel." *United States v. Mikalajunas*, 186 F.3d 490, 493 (4th Cir. 1999) (citing *Murray*, 477 U.S. at 488). In order to avoid a procedural default based on the "actual innocence" exception to default, a movant must show that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him because of his "factual innocence, not mere legal insufficiency." *Bousley*, 523 U.S. at 623.

In this case, McQueen alleges that blame for not bringing any of his claims on direct appeal is attributable to ineffective assistance of counsel. Mot. Vacate Mem. [DE-147-1] at 74. This argument must fail because McQueen filed a *pro se* supplemental brief before the Fourth Circuit Court of Appeals raising numerous issues not addressed by his appellate counsel.

To the extent that McQueen's claims of actual innocence could excuse his default, McQueen must show factual innocence and not mere legal insufficiency. Specifically, McQueen "must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Bousley*, 523 U.S. at 623 (internal quotation marks and citation omitted). McQueen was convicted following a trial; thus, he simply cannot meet this burden.

In sum, McQueen has failed to demonstrate either "cause" and "actual prejudice," or that

35

he is actually innocent. Consequently, McQueen's twenty-second, twenty-seventh, and twenty-eighth claims are procedurally defaulted and must be dismissed.

### 4. McQueen is not entitled to relief on his tenth claim.

In the tenth claim set forth in his § 2255 motion, McQueen alleges that his attorney provided ineffective assistance of counsel by refusing to allow Connie Diane Jones to testify on his behalf at trial. Mot. Vacate Mem. [DE-147-1] at 44-45. According to McQueen, this was prejudicial to him because Jones's testimony would have "impeached" the Government's case and contradicted its version of events. *Id.* at 45. The court concludes that McQueen has stated a claim for ineffective assistance of counsel under *Strickland.* Because the Government has failed to show that it is entitled to dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Government's Motion to Dismiss is DENIED as to this claim, and the court will proceed to consider its merits.

#### a. Evidentiary Hearing Testimony

##### i. Connie Diane Jones

McQueen called Connie Diane Jones as a witness at the January 20, 2016 evidentiary hearing. Jones stated that her date of birth is August 14, 1955. Jones testified that she currently lives in Fayetteville, North Carolina, and has lived in Fayetteville since 1974.

Jones stated that she has known McQueen for years, ever since she was about twenty-one years old. Jones further stated that she considers McQueen to be a good person. Jones considers McQueen to have been her friend over the years. Jones testified that she considers McQueen to be a close friend, but she did not discuss personal things with him. Jones testified that before McQueen was arrested he was her pastor. Jones explained that she was a member of the church

36

McQueen founded, The Burning Bush. Jones testified that she met McQueen when he bailed her out of jail while working in his position as a bail bondsman. Jones explained that McQueen has served as her bondsman on two occasions.

Jones testified that she remembered McQueen being arrested in 2008, and she learned that McQueen had drug charges. Jones stated that she was aware of the facts surrounding McQueen's arrest because she read about it in the Fayetteville Observer newspaper. Also, Jones testified that everyone on Murchison Road saw it when Chester Hunt was arrested. Jones stated that she never purchased heroin from McQueen. Jones testified that McQueen was not involved with drugs and has been wrongly imprisoned.

Jones testified that she met with McQueen's attorneys. According to Jones, the first meeting was approximately two weeks after McQueen's arrest. Jones explained that during the first meeting, she made an audio statement. Jones stated that they discussed the charges against McQueen. Jones testified that the second meeting took place with a different attorney for McQueen and occurred about a year after McQueen's arrest. Jones stated that McQueen's attorneys did not tell her whether they anticipated calling her as a witness at McQueen's trial.

Jones testified that McQueen's attorneys never advised her to consult an attorney herself. Jones further testified that she was not advised that she could be charged with any crimes if she testified. Jones stated that she told the attorneys about her prior arrests and convictions.

Jones stated that she knew a woman named Stephanie Clark. Jones described Stephanie Clark as being white, having long brownish looking hair, and being about 5'4" or 5'5" tall. Jones met Clark at Madeline or Nadine Chambers's house. Jones stated that at the time, Clark was pregnant and suffering from heroin addiction. Clark was asking Madeline for heroin. According

37

to Jones, she never saw McQueen with Chambers. Additionally, Jones stated she has no knowledge regarding whether McQueen and Chambers knew each other.

Jones stated that she met Chambers in jail when she got busted at the Greyhound bus station for bringing crack cocaine on the bus. Jones explained that she helped get Chambers a lawyer and got her bond reduced. Jones testified that she bought cocaine from Chambers, but she did not know where Chambers purchased her drugs.

Jones explained that she saw Clark at Chambers's house maybe three times. Clark was pregnant each time. Jones testified that she had witnessed Clark both purchasing and using heroin. Jones testified that she never met Clark's husband, Justin. Jones stated that she never saw Justin at Chambers's house.

Jones testified that in June of 2010 she came to the federal courthouse to testify for McQueen. Jones stated that she rode to the courthouse with McQueen's son, James McQueen. James did not tell Jones about the facts of McQueen's case. According to Jones, the prosecutor or someone said it was not good for her to testify for McQueen. Jones explained that she was not called to testify at McQueen's trial.

Jones stated that she is familiar with an individual named Chester Hunt and knows him as a drug dealer. According to Jones, Hunt stands on the corner and sells drugs, specifically heroin. Jones testified that she had never purchased drugs from Hunt. Jones stated that she knew Hunt was arrested as part of McQueen's case because she read it in the paper.

Jones stated that she was never interviewed by police following McQueen's arrest in 2008. Jones further stated that she was not interviewed by police following McQueen's conviction in 2010.

38

On cross-examination, the Government presented Jones with an affidavit purportedly written and signed by her that was filed in support of McQueen's § 2255. *See* Gov't's Ex. 1. Jones repeatedly stated that the affidavit was "not true." Jones admitted the affidavit contained her signature. On redirect examination, Jones changed her testimony and stated that the affidavit was "true." Jones stated that she wrote and signed the affidavit. Jones explained that she wrote out the material in the affidavit and it was typed up for her.

Jones testified that during the mid-2000's she worked doing home healthcare, a part-time job. Jones stated that her work involved taking care of people who could not care for themselves. Jones further stated that she was not struggling with drug abuse at that time.

Jones testified that she had cleaned a residence owned by McQueen that was located on Slater Avenue. Jones explained that McQueen owned several rental properties and she cleaned them.

Jones testified that she previously had a shoplifting problem. Jones stated that during the time that she was shoplifting, she was also smoking marijuana. Jones admitted that in 2005, she pled guilty to felony possession of cocaine. Jones stated that as part of her sentence she was required to participate in a methadone program. Jones also admitted that in 2012, she pled guilty to misdemeanor possession of drug paraphernalia. Jones explained that the guy she was riding with had the drug paraphernalia in the car, and she pled guilty because she had her grandkids with her and didn't want to risk getting Social Services involved. Finally, Jones admitted that she pled guilty to passing a worthless check. Jones acknowledged that she knew she did not have the funds to satisfy the check when she wrote it. According to Jones, she went to court and paid the check off.

39

Jones testified that she used drugs most of her life. Jones admitted to using marijuana, cocaine, and heroin. According to Jones, she got clean in 2007 when her daughter died. Jones stated that she has not used any drugs since she got clean.

### ii. James McQueen

McQueen also called his son, James McQueen, as a witness at the January 20, 2016 evidentiary hearing. James testified that he lives in Fayetteville, North Carolina. James stated that he knows Connie Jones and has known her maybe fifteen years or so. James explained that he knows Jones from church, his father, and living in the small community of Fayetteville.

James recalled that in 2008 his father was arrested on drug charges that originated in state court. James acknowledged that his father hired his first attorney, Coy Brewer, in October or November of 2008.

James explained that he got stuck with role of investigator in McQueen's case as they prepared for trial. James explained that attorney Arora was out of Atlanta and attorney Beaver was out of Fayetteville, and he was chosen to get statements to save costs. James stated that he knew which witnesses to contact from attorney Arora and also from information found in a newspaper article about his father's case. James explained that he did not talk with his father because his father was in custody and his statements were recorded. James stated that it was his job to go find the witnesses and get statements that he brought to the attorneys.

James stated that he had "a lot" of communication with attorney Arora during Arora's representation of his father. James explained that they talked a lot and sometimes talked weekly.

James stated that Jones was a witness that his father's attorneys wanted to speak with. James stated that he assisted Jones in meeting with attorneys Beaver and Arora about six months

40

before trial. According to James, the attorneys told James that they felt positive about McQueen's case and their feeling that McQueen needed to plead guilty was dismissed. James stated that it was his understanding that Jones would testify at McQueen's trial.

James testified that he was present at his father's trial. James stated that he brought Jones to the federal courthouse because McQueen's attorneys, Beaver and Arora, told him to bring her to court. James explained that he brought Jones inside the courthouse, but McQueen's attorneys instructed him that it was in Jones's best interest to leave the courtroom and go to the other side of Wilmington. James stated that he proceeded to get Jones and leave the courtroom. James explained that he took Jones to a restaurant.

James testified that he was aware that Jones made recorded statements. James stated that the first statement was made with the state attorney. James testified that he was not present in the room at the time of the statement. James stated that the second statement was made to McQueen's attorneys in their meeting some months before trial. James testified that he was not in the room at the time of the statement.

### iii. Robert L. McQueen

Robert L. McQueen was called at the January 20, 2016 hearing as a witness in his own case. McQueen testified that he met Connie Jones about twenty or more years ago. According to McQueen, he knew Jones from being a drug counselor at the methadone center because Jones used to come in. Also, McQueen stated that Jones was a member of his church. McQueen explained that he continued to see Jones over the years. McQueen stated that he and Jones became friends after he did the eulogy at her daughter's funeral and she joined his church. McQueen testified that he also knew Jones in his capacity as a bail bondsman who provided her

41

with services. McQueen stated that Jones was known to be in the business of shoplifting, and he was not aware that she had any legitimate employment. McQueen acknowledged that he and Jones did not share personal information with each other.

McQueen acknowledged that in October of 2008 he was arrested on drug charges. The case originated in state court. McQueen stated that he provided his attorney for the state charges with a list of witnesses. Jones was a listed witness.

McQueen acknowledged that he was indicted in federal court over the same drug charges. McQueen testified that he hired new attorneys for his federal case, Arora and Beaver. McQueen stated that while the federal case was pending he was in custody.

McQueen explained that he provided his federal attorneys with a list of potential witnesses, which included Connie Jones. McQueen believed Jones was relevant because when the case was opened she was involved. According to McQueen, Jones was a central person in the case. McQueen stated that based on his communications with Arora and Beaver, he believed that Jones would be called as a witness at his trial.

McQueen testified that Jones was not called as a witness. McQueen stated that he wanted Jones to be a witness and did not give his attorneys permission for her not to be a witness. McQueen stated that the decision not to call Jones was not discussed with him. McQueen testified that Arora and Beaver did not explain their decision not to call Jones as a witness. McQueen explained that he found out that Jones would not be called as a witness after his attorneys called two character witnesses and rested his case. McQueen stated that he wanted information about his license to get a gun admitted into evidence. Also, McQueen stated that he wanted the information about appearance bonds entered into evidence to show how he

42

accumulated the money found on him. McQueen testified that he also wanted evidence about Nadine living in the house at 1900 Slater Avenue residence admitted. McQueen stated that there was no evidence presented to show that bondsmen carry weapons.

McQueen testified that his attorneys did not discuss defense strategies with him, and he had no idea what their working theory of his case was. McQueen stated that his attorneys did not discuss with him how they were going to explain the surveillance images of him at the Slater Avenue house.

McQueen was asked about Jones's affidavit that is attached to his § 2255 motion. *See* Gov't's Ex. 1. According to McQueen, Jones wrote the document, it was read to McQueen, McQueen's wife typed the document, and Jones signed the document.

McQueen acknowledged that he had submitted an affidavit in support of his § 2255 motion. *See* Gov't's Ex. 2. McQueen acknowledged that in his affidavit he stated that he had rented the 1900 Slater Avenue apartment to Ms. Chambers and was allowing her to leave her stuff there. McQueen testified that he did not have an inmate relationship with Ms. Chambers

### iv. Manubir S. Arora

The Government called Manubir S. Arora as a witness a the January 20, 2016 evidentiary hearing. Arora testified that he has been a lawyer for twenty-three years and is a retired Air Force JAG. Arora stated that he has served as both a prosecutor and a defense attorney. Arora also stated that he has litigated between seventy and one hundred criminal cases and managed a few thousand more cases that resulted in a plea. According to Arora, half of the cases he has litigated were done so as defense counsel. Arora testified that about half his cases have been state and half have been federal.

43

Arora explained that he met McQueen because he had a client in the Atlanta area that he had been representing on unrelated matters and who referred him to McQueen and his family. Arora stated that when he entered his appearance, McQueen had been arrested. Arora stated that he came to Fayetteville about half a dozen times to meet with McQueen's family. Additionally, Arora stated that he came to Wilmington several times to see McQueen when he was in custody here.

Arora stated that he interviewed several lawyers to help assist him in the case as local counsel. Arora explained that Beaver was the highest recommended attorney, so he decided to work with him. Arora further explained that he and Beaver tried to cut the workload in half. Arora stated that Beaver took a lot of the law enforcement folks because he was familiar with them, and Arora took the other non-law enforcement fact witnesses. Arora explained that he did the opening and closing arguments as well. Arora testified that theoretically he was lead counsel so he had the final say in the case, but because Beaver has a world of experience, they discussed things together.

Arora testified that he met Connie Jones a couple of months before trial. Arora stated that Jones mentioned she had been caught shoplifting a bunch of times, she had maybe a couple of prostitution arrests, and she also had a drug arrest. Arora stated that Jones told him that McQueen bailed her out on some if not all of those charges.

Arora testified that he met with McQueen the Wednesday night of trial to go over everything, including whether or not he was going to testify. Arora stated he is certain he would have discussed the decision not to call Jones with McQueen, but he does not have an independent recollection of discussing it.

44

Arora testified that because McQueen's codefendant, Chambers, had fled, the trial strategy was to say Chambers was renting the space from McQueen and McQueen had no knowledge of any heroin dealing. Arora testified that a strength of the Government's case was the surveillance. Arora also felt that the Clarks, confidential informants, were credible in their testimony. Arora testified that the Clarks' testimony came across very well at trial. Arora stated that it appeared to him that the jury was sympathetic to the Clarks.

Arora testified that Jones's testimony would have contradicted portions of the Clarks' testimony, but the references to Jones had been excluded on the audio recordings and arguably that would have been admissible again. Arora further testified that Jones's testimony would have contradicted what the Clarks said about the relationship with McQueen but it would sort of bolster what the Clarks said about their original supplier. Arora stated that determining whether or not to use Jones involved a huge risk-benefit analysis. Arora felt that Jones would have done more harm than good based on cross-examination material that would have come out. Arora stated he also believed that the Clarks would have been called back to the stand for rebuttal purposes. Arora stated that he did not believe that calling Jones was worth the risk she presented. In addition, Arora testified that Jones would be irrelevant to their trial strategy.

Arora stated that at the time of the start of the trial he had not made a decision about whether or not to call Jones to testify. Arora stated that he asked McQueen's son to have all the witnesses come in. Arora testified that Jones was placed on the witness list because he wanted to see how the trial would play out before a final decision was made about calling Jones.

### v. H. Gerald Beaver

The Government called H. Gerald Beaver as a witness at the January 20, 2016 evidentiary

45

hearing. Beaver testified that he graduated from the University of North Carolina at Chapel Hill law school in 1973. Beaver also testified that he had two years of practice as a state's assistant public defender in Fayetteville. Beaver stated that he then went into private practice with a series of small firms. Beaver explained that in the late 1970's he started his own practice which grew to the law firm he has been with since that time.

Beaver stated that he has been practicing law for forty-three years. Beaver explained that originally he took anything that came through the door. Beaver testified that he later developed a specialty in criminal law. Beaver stated that in the mid-1980's to early 1990's, with the advent of the Federal Sentencing Guidelines, he began to develop his practice in the area of federal criminal defense as much as possible. Beaver testified that he serves on the CJA Panel and handles cases for this District, the Middle District of North Carolina, and the Western District of North Carolina.

Beaver further testified that he first got to know McQueen when McQueen was arrested on state charges. Beaver testified that he had known McQueen for a number of years before that because McQueen had been a well-known bondsman in the Fayetteville community. Beaver stated that McQueen was represented by an attorney named Dave Bollick on the state charges.

Beaver explained that McQueen had contacted Arora, and Arora contacted Beaver about serving as local counsel. Beaver testified that he became more involved in the case than had previously been involved in cases where he was serving as local counsel. Beaver stated that part of the reason was because of his proximity to Wilmington, he was able to see McQueen more than Arora was.

Beaver stated that he and Arora talked with McQueen and his family to identify defense

46

witnesses and reviewed discovery from the Government. Beaver stated that they came up with a list of potential character and fact witnesses.

Beaver stated that Connie Jones had given a video statement to attorney Bollick. According to Beaver, Jones became a person they were interested in finding as a potential witness. Beaver stated that he does not recall them speaking to Jones prior to trial. Beaver testified that his recollection is that Jones was not found prior to trial. Beaver explained that Jones's name was placed on McQueen's witness list. Beaver testified that James McQueen brought Jones to court on either the Wednesday or the Thursday of the trial. Beaver expressed his belief that Arora made the decision not to call Jones as a witness after they "excessively" discussed it.

Beaver described McQueen's trial strategy as seeking to portray that McQueen was a known and respected bondsman and a minister in town. Beaver stated that they tried to rely on the failure of the Government's evidence to constructively connect McQueen personally with the Clarks, the two main accusers in the case. Beaver testified that the Clarks did most of their dealing through Mrs. Chambers and her husband.

Beaver stated that he thought Mrs. Clark was a particularly effective and very credible witness. Beaver stated that Mrs. Clark broke down in tears several times during the trial. Beaver also stated that Mrs. Clark appeared to be a very reluctant Government's witness. According to Beaver, at one point during a break, he noticed Mrs. Clark mouthing to Randy Chambers I'm sorry I have no choice.

Beaver concluded that Mr. Clark was a less effective witness. Beaver stated that Mr. Clark was a former soldier who had been convicted by court martial of various theft charges.

47

Beaver testified that Mr. Clark did not come across nearly as believable as his wife. Beaver did note that Mr. Clark still corroborated his wife on many of the particulars of her testimony.

Beaver testified that he and Arora discussed the risks of calling Jones as a witness. Beaver pointed out that the defense had been successful with an objection to certain recorded conversations that had been monitored between Ms. Chambers and Mrs. Clark where Jones was discussed. Beaver explained that they were able to get the recordings redacted to remove the references to Jones on hearsay grounds. According to Beaver, this resulted in no physical evidentiary tie between McQueen or Jones and Nadine Chambers. Beaver pointed out that if Jones testified, this could reverse the evidentiary ruling and lead to a evidentiary link between the Clarks and Jones. Beaver also pointed out that another consideration was Jones's prior history that she would be impeachable. Beaver testified it was his knowledge that Jones had shoplifting charges and possibly prostitution charges. Beaver noted that Jones had a cloudy criminal history and had repeatedly been bonded out by McQueen. Beaver also stated that because Jones's testimony would contradict that provided by Mrs. Clark, Jones could be subject to rebuttal testimony and impeachment. Beaver explained that their strategy was to minimize Jones's role. Beaver described Jones's proposed testimony as a "blip on the radar screen" when compared to the other evidence in the case. Beaver testified that it factored into their consideration that Jones was a heroin user. Finally, Beaver said when they talked about Jones's testimony they also talked about implications to her if she testified.

Beaver testified that the strength of the Government's case came from the Clarks' undercover work. According to Beaver, the Clarks would go to Mrs. Chambers's residence and make a request for heroin. Chambers would say she needed time to get more heroin, and

48

then be seen going to meet up with McQueen.

Beaver testified that he did not have the conversation with McQueen about Jones not testifying. Beaver stated that in McQueen's case, they called two character witnesses and no fact witnesses.

Beaver testified that McQueen wrote him in December of 2011 and wrote the Fourth Circuit Court of Appeals asking that Beaver provide his file. Beaver stated that on January 21, 2011, he mailed McQueen's complete file to him. Beaver explained that except for the discovery and appellate documents in his possession, he was having to rely upon his memory about the case.

### b. Discussion

At the outset, the court notes that the presumption of reasonableness in *Strickland* is particularly difficult to overcome in a claim of ineffectiveness for failing to call a witness because "the decision whether to call a defense witness is a strategic decision demanding the assessment and balancing of perceived benefits against perceived risks, and one to which we must afford . . . enormous deference." *Terry*, 366 F.3d at 317 (quotation and punctuation omitted). In this case, the evidence before the court reveals that McQueen's highly experienced defense attorneys, Beaver and Arora, considered Jones's criminal background and the court's evidentiary ruling that kept out the link between McQueen or Jones and Nadine Chambers and weighed all this against what Jones had to offer as a witness. They ultimately decided not to call her to testify at McQueen's trial. The court finds that Beaver and Arora made a considered decision when they decided not to have Jones testify. Moreover, defense counsel's decision not to call Jones in this case falls within the broad deference accorded to defense counsel's decision

49

regarding whether or not to call witnesses. For these reasons, the court concludes that McQueen has failed to show that he received deficient assistance under the first prong of the *Strickland* standard.

McQueen has made an insufficient showing on the performance prong of the *Strickland* standard; thus, this court need not address the prejudice prong. *See Strickland,* 466 U.S. at 697. Consequently, McQueen is not entitled to relief on his tenth claim.

## B. Motion to Compel Discovery and Request for Leave to Subpoena Telephone Records

McQueen has filed a Motion to Compel Discovery [DE-149] from the Government in which he requests the documents set forth in the memorandum filed in support of his § 2255 motion. *Id.* at 1-2. McQueen has also filed a Request for Leave to Subpoena Telephone Records [DE-150] in which he seeks phone records from his phone and his codefendant Madeline Nadine Chambers's phone, which are held by T-Mobile and Verizon Wireless. *Id.* at 2.

Pursuant to Rule 6(a) of the Rules Governing Section 2255 Proceedings, "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law." Unlike the ordinary civil litigant in federal court, a habeas petitioner is not entitled to discovery as a matter of course. *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). A petitioner bears the burden of showing "good cause" and must "present specific allegations that give the Court reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief." *Fenn v. United States*, Nos. 1:12-CR-510 (JCC), 1:15-CV-578, 2015 WL 3868583, at *2 (E.D. Va. June 23, 2015) (quoting *Pizzuti v. United States*, 809 F. Supp. 2d 164, 176 (S.D.N.Y. 2011)). The court will not allow a mere fishing expedition through the

50

government's files with the hopes that damaging evidence will be found. *Id.*

In this case, the court concludes that McQueen has failed to establish "good cause" and has not presented specific allegations suggesting that if the facts were fully developed he would be able to demonstrate that he is entitled to relief. The court will not authorize McQueen to go on a fishing expedition. Accordingly, McQueen's Motion to Compel Discovery [DE-149] and Request for Leave to Subpoena Telephone Records [DE-150] are DENIED

## IV. Conclusion

For the foregoing reasons, the Government's Motion to Dismiss [DE-156] is ALLOWED in part and DENIED in part, and McQueen's § 2255 motion [DE-147] is DENIED. McQueen's Motion to Compel Discovery [DE-149] and Request for Leave to Subpoena Telephone Records [DE-150] are DENIED.

A certificate of appealability will not issue absent "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When the court denies relief on the merits, a prisoner satisfies this standard by demonstrating that reasonable jurists would find that the court's assessment of the constitutional claims is debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see Miller-El v. Cockrell*, 537 U.S. 322, 336-38 (2003). However, when a court denies relief on procedural grounds, the prisoner must demonstrate both that the dispositive procedural ruling is debatable, and that the motion states a debatable claim of the denial of a constitutional right. *Slack,* 529 U.S. at 484-85.

The court concludes that McQueen has not made the requisite showing to support a certificate of appealability. Therefore, a certificate of appealability is DENIED.

SO ORDERED.

51

This the ___ day of February, 2016.

James C. Fox
Senior United States District Judge